Okay. The next argued case, December 15, 1976, Aley v. Innovation Law Group, Ltd. Mr. Aley. Good morning, your honors, and may it please the court. My name is Ryan Aley. I am the applicant appellant here. Your honors, this court should reverse the board's likelihood of confusion determination. If the board committed error in the Jack Wolfskin and Juice Generation cases decided just this year, then the board certainly committed error here, just looking at the facts between these cases and the case at bar. We can see this in the first DuPont factor particularly, comparing the marks for similarities and dissimilarities. There are two legal errors that the board- Trademark cases are very fact specific, and here what you want to register is really the reverse of the words from the registered mark. Well, your honor, we submit that trademark cases are very fact dependent, and that's why indeed we think the facts are very comparable between the Jack Wolfskin and Juice Generation cases. And certainly, your honor is correct that at some level you can say these marks do say the same thing, and where they do say the same thing, they are descriptive. They both describe what intellectual property lawyers do. They take ideas and turn them into assets for their clients. That cannot be a basis for confusion. This court reiterated that in Jack Wolfskin and Juice Generation. At some point, every mark that is suggestive can be abstracted to say, oh, you're really saying the same thing, but that cannot be a basis for likelihood of confusion. And primarily the board, in its consideration under the first DuPont factor, never went through that analysis. There's no recognition by the board that these marks using asset and idea are both very common and even worse than Jack Wolfskin and Juice Generation, are descriptive of the services at issue. So really, we think that there are two areas that merit reversal here, versus the dissection out of ideas and assets in order to find some similarity between the mark. And second, worse than Jack Wolfskin and Juice Generation, is the failure to discount in the analysis any recognition of how commonplace these words are and how they describe the services at issue. I'd like to go into these two issues in a little more detail. On the dissection issue, we see the board's decision spans all two paragraphs, looking at the similarities and dissimilarities of the mark. In fact, they only quote the terms asset and idea in the marks. There's no quoting of building or transforming the omission of the word business in an applicant's mark. The reversal of terms, one difference, the different preposition, they focus on only two words. We submit that's textbook dissection. And moreover, there's... Do you disagree, though, that the two marks are conveying somehow turning ideas into assets? I will admit that at some level, yes, Your Honor. They do convey that same descriptive commercial impression. In fact, it's very similar to this court's predecessor case in the Yale-Bruce case. You had termicide and terminex. Those were for termite killers. The court said, no confusion. You could easily say in that case, oh, well, termicide and terminex, they say the same thing. It's sort of termites. But this court said, well, no, that's the services at issue. You're selling these on off-the-shelf termite killers. So the fact that these two marks come close to one another is permissible because they're both treading on that same descriptive commercial impression. Here where the board took a descriptive commercial impression and used it as the basis for similarity, it committed the same error. And really what we see in... Is your argument that all these marks are really descriptive and shouldn't be trademarked in the first place? I don't think so, Your Honor. I think marks can simply hew much closer to one another when they have descriptive aspects. This court's case law says that consumers really do distinguish between marks on less descriptive portions. And we freely admit the word transforming in a poser's mark is probably his hook for protection. There are a few other transforming marks out there by other IP attorneys, but not as many. And it's certainly different than building, and there are no building asset marks out there. And I think really, just as this court reversed and used generation and Jack Wolfskin, the analysis in Jack Wolfskin comparing the marks spans six pages. What were the marks in Jack Wolfskin? Two paw prints. One was just a paw print. The other was a paw print with the following word, Calmay, after it. Right. The board, in that decision, spent six pages discussing both the... Well, there was a big difference. While they both had the paw prints, one had this added word, Calmay. That's quite a difference. Certainly, Your Honor. And just like here, we have the added word building, which nowhere appears in a poser's mark. We don't use the word business. But what is central to these marks are assets and ideas, which that's what the slogan is all about. And both of them contain the same words, key words. Your Honor, I would submit that there's no evidence in the record that shows that asset and idea are what these marks are all about. If anything, the record shows that there's several, dozens, over 100 third-party uses of marks in IP law using the words asset and idea. Maybe that's your best argument, that how can there be confusion if there hasn't been already? That's exactly right, Your Honor. And this has been used to expand over years. And this was an argument we made at the board. There is no evidence of confusion on these marks, on all these third-party marks that have gone back the better part of a decade among several distinct users of intellectual property law. The board even credited the finding in their discussion of the fourth DuPont factor that, wow, yes, there are all these marks. There's a large law firm in New Jersey that uses the mark transforming ideas into assets. There's several other practitioners who say transforming ideas into assets, turning ideas into assets. So then the trademark board did take that into account. They took it under account only under the fourth factor in looking at the number of marks in issue. This court has said that you're also supposed to take that into account when comparing the marks under the first factor, the primary factor, which says, let's discount things that are common or descriptive and not use those as the basis for consideration. And in fact, in the board opinion here, we don't see any discussion of that in the first factor. There's no recognition. I think, Your Honor. It's a bit tricky to even attempt to separate out what is descriptive from possibly suggestive from these marks. I mean, it's just both of them are connoting a certain theme and it's not really a compound mark that you can break into two, like say the Jack Wolfskin case where there was a word and then there was a little picture where, again, maybe the trademark board in that instance hopefully focused on one and ignored the second part of that compound mark. But this is not really a compound mark. You're right, Your Honor. It's a long descriptive verbal mark where sound and appearance would be much more important in determining how are consumers looking at this. And the board doesn't go into any real discussion of how do these sound and appear aside than to say they're different in that sense. Do you need actual confusion in order to prove likelihood of confusion? I thought the answer was no. The answer is no, Your Honor. The test does go the other way though under the absence of confusion factor. If there is opportunity for confusion and we submit on this voluminous record of many, many IP practitioners for the better part of a decade, in fact the evidence, some of it goes back to 2002, using the term transforming ideas into assets, there's been no confusion. The board properly found that consumers of IP legal services are sophisticated. This is not an off-the-cuff impulse buy. I think this all just reaffirms that there is no likelihood of confusion here and, in fact, had the board conducted its analysis under the first factor correctly, that would have mirrored that finding because they would have said, well, hey, yes, at some point we can see, we can abstract these to be the similar idea, but that's descriptive. The board said that it had been in actual use for about a week before the application was filed. And are you saying then that it was in continuous use after the application was filed and while these proceedings were going on and that no evidence of subsequent confusion was shown? That's correct, Your Honor, with regard to applicant mark and opposers mark. There were over four years of potential concurrent uses before the board decision where there could have been evidence for confusion. You say before the decision but after the application? Yes, four years, no evidence of actual confusion. But moreover, we argue this, that when you have such a record of so many additional third-party uses and you also have evidence that opposer takes careful notes of every contact of how people contact him based on his mark and there's been no confusion on any of these third-party marks either, that is also evidence that there's simply no likelihood of confusion here. Consumers of intellectual property laws simply aren't going to confuse myself and an opposer based on this slogan. I really just want to reemphasize that the same analysis that the board undertook in these cases and even juice generation where the mark was peace and love and juice, which was a little more lengthy like the case here, the board went through several pages of discussion there, really analyzing each term, talking about how these marks appeared, talking about how they sounded. We don't have any of that in the board decision below. We have two paragraphs that quotes ideas and assets, which is admittedly the most common aspect of these marks and are used to describe what practitioners and intellectual property do. We submit under the facts of Jack Wolfskin and juice generation. This case cannot be affirmed, what the board did here. As I said, your honor, there are other factors at play here. We have argued that the eight factors I just went through, the lack of actual confusion was not properly credited by the board and further there was evidence and argument on the third, ninth, and twelfth factors that the board simply didn't even address. We don't even know if the board appreciated that they were of record. I'll stand as those arguments remain on the brief, but we do think that those are additional avenues for reversal. If your honors have no questions on those matters, I won't go into them. But in closing, your honors, this case comes on appeal with its first factor misweighed really worse than Jack Wolfskin and juice generation and it comes with more DuPont factors already weighing against likelihood of confusion than either Jack Wolfskin or juice generation. Namely, this case involves sophisticated purchasing conditions, whereas those cases did not. And it comes with even more third party usage than Jack Wolfskin or juice generation without any actual evidence of confusion. Neither of those cases were affirmed. We ask this court to reverse the likelihood of confusion here, just like in Jack Wolfskin. I'll serve the rest of my time. Okay. Thank you, Mr. Alley. Mr. Doolin. Good morning, your honor. I apologize if my voice is a bit scratchy. I sound like Warren Buffett, I guess. That's an allergy problem. This appeal is about initial interest confusion. It's not about informing a post contact prospect about the attorney's background in order to gain engagement. Did the board say anything about initial? Did the board say anything about initial interest confusion? I don't believe the board went off on that theory. I don't think they used those exact words, but they did quote from the evidence in the case extensively, the black declarations and testimony, and black is an expert in the field of branding, about what initial interest confusion is all about. We did cite that. There is an extensive portion of our brief below the initial interest confusion, in fact, was raised below to the board. Mr. Doolin, if there is so much usage out there, a phrase like this used by IP firms, and there isn't a lot of record of likelihood of confusion, did the board use the wrong criterion to reject this mark? Maybe it was more descriptive than likelihood of confusion. Your honor, the mark is incontestable. Talking about descriptiveness of the mark is a collateral attack. He could have filed to cancel the mark based on that. He did not. He just stopped from raising it at this level. That is just a red herring, and he keeps dragging that back in front of the court. I'm sorry. Are you saying he could have challenged your mark as descriptive? We have a registered mark. He can petition to cancel. But you said it's incontestable. I agree it's incontestable. He could have contested it on perhaps other grounds of fraud or something of that nature. But he would not have been able to challenge it under a descriptiveness theory, is that right? No. Not at all. But the point is... So if your mark smells descriptive, there's nothing that anyone can do about it? Well, common elements can be used in a mark, and I call the court's attention to the Specialty Brands case on page 42. I'm just asking a question. If a registered mark has been deemed incontestable because it's been registered for X number of years, are you saying there's nothing that anybody can do at that point to challenge the validity of that registered mark under the theory of descriptiveness? I don't know of cases that permit that. I don't think it's an issue that should be raised here at this point in time. What he is attempting to say is that there's lots of third-party uses, the question that Judge Lurie asked. And I will call the attention to the fact that we have analyzed all of those alleged uses on his part. But your view would be, presumably, aside from all those third-party uses, the use of this mark would be confusing with respect to the registered mark. That's correct. And the law does not require us to sue everybody simultaneously. We have addressed, since 2004, some 12 different people who have attempted to basically infringe on our mark rights, and we have stopped them. It's unlike the way it's portrayed by Mr. Alley. The board looked at the 67 different instances in 135 pages of citations. The board singled out 17 of those for review as being the most relevant examples of Internet sites. Two have no active page. They're meaningless. Two more don't offer legal services. They're meaningless. Five more no longer use the listed phrase, even if they ever did. Four more have or had different phrases or slogans. And the remaining six all stopped their usages of concern after enforcement by us. Our position, very simply, is we objected to that evidence. The court, the board basically says, we can figure it out. Rely on us to sort the good from the bad. And they basically have reviewed and determined that the websites that he has are either hearsay, unauthenticated, don't say what they claim to have said. The law simply is that a website citation is not proof of the truth of the matter stated. It is simply the citation. And I also want to comment on one very important thing. He claims there's four years of concurrent use. That's not true. For over two and a half years, he had his slogan embedded in an image that included his trade name, Ryan Alley Law, or whatever he calls himself. That's his trade name. That is not searchable on the internet. There is evidence in here by Kirk Thomas, who's an expert on internet information, that points out that when the slogan is embedded in the image, it is not searchable. It cannot be indexed. It cannot be looked at. You could try to look up ideas and assets, and you'll never find him. You will find us. And he claims that he did a search beforehand in the trademark office, and he didn't find us. And yet, we have a declaration in here by a paralegal, who is now an attorney, who went in and searched it in two minutes, pulled us up. So we feel that there is an undercurrent of trickery and bad faith going on in the case with respect to adopting the key word, ideas and assets. I think we can leave out the accusations. Let's just talk about the merits. I'm sorry, yes. I apologize, Your Honor. We think that while the factual findings of the board are well supported by credible, relevant evidence on the record, your de novo review, when it's properly weighed in the light of the nature and the function of the marks in the arena of initial interest confusion, will find the cases even stronger. The real key here is a similarity of the marks as a function to motivate and generate initial interest. And that is a key aspect here. The initial interest trademark, it's a marketing tool. It's designed to motivate the prospect of customer or the client. And in the case of the legal services here, to motivate the prospect to contact the attorney. Here's the issue. In the phone books, there's millions of attorneys. In the internet, there's billions and billions of attorneys. If I can use a phrase of my former classmate Carl Sagan about billions and billions, how do you stand out? How does an attorney stand out? The key question here is how to get somebody to pick up the phone and say, I want to call that attorney rather than this attorney. And that's what initial interest trademarks do. Trying to land a client or a customer is a process. Some occur quickly at the supermarket. Some take a long time, Boeing trying to get a contract from the government. But the key thing is they all start somewhere and they start with contact. And lawyers are not permitted to contact potential customers, clients. Clients have to call back. I think limit the argument to whether there's likelihood of confusion. Sorry? Let's limit your argument to the grounds on which it was rejected. Yes, the initial interest trademark functions to have the attorney stand out amongst the crowd. That's what they do. Here's a couple of examples. Futures Now will turn today's events into tomorrow's profits. LifeLock, why monitor a problem if you don't fix it? Innovation Law Group, transforming ideas into business assets. And our companion mark, transforming ideas into assets without the word business. And business assets is very similar to building assets. And the inversion is very simple. You have to change into to from in order to invert the word order. And inversion marks are very well recognized in the law as being, I mean, inversion of marks is well recognized in the law as being infringement, as being confusingly similar. So what the slogans do is they filter by the term ideas. How do we distinguish IP law from PI law? How do I prevent somebody who calls me up and says, I got a divorce matter, or I got a bankruptcy matter, or I got a criminal matter? I don't want that. I can't have those kind of calls coming in. It overwhelms us. So using the word idea in there helps the people and it speaks to their need to get the idea out of their head into something tangible. And, hey, if their goal is a business, making it into a business asset is part of their ultimate goals. And there ain't no inventors that don't want to make money out of their ideas. So it makes sense. We say that the building assets from ideas is an inversion. Black went into complete detail regarding that, several pages. I'd love to have time to read it here. I don't. But the point is it's referred to in our brief. You can take a look at page 37 of the brief in there. She concludes that there's no significant difference in the sense of the message, and I believe Mr. Alley agreed to that in his argument. The board quoted Black. He only refers to what the board said. He doesn't refer to the embedded testimony of Black, which is unrebutted. He offered no testimony, just his personal views, which our view is that that's not true evidence. The key concepts are assets and ideas. The into has to be changed to from in order to reverse the order. And the board did not go through a impermissible dissection. It focused on the key aspects, the key portions of the DuPont factors, the comparison of the marks. And, of course, you'll notice that he does not argue about comparison of the goods and services, second factor, because that's admitted. And the board found the services to be identical. He has inconsistent arguments about trade channels, and he also argues that some of this Internet citations that he have tends to show that there is distinction in the geography. He says at one point that he's on the East Coast, we're on the West Coast, and yet he relies on the Internet for his evidence. Those are inconsistent positions. He also, in order to rebut the idea of initial interest confusion, relies on the post-contact detailed discussion with the potential client of all of the things that the bar requires him to tell the client. That's at the tail end of the process. That does not excuse initial interest confusion, because the critical thing is getting that call in the door. It's not how he moves the potential client to become an active client. And I will refer the court to the famous horse case on page 45 of our brief. It's only after the contact that this degree of care aspect of a review of trademarks comes into play and the degree of care does not does not contradict or should I say does not negate the initial interest confusion. Okay, I think we're out of time, but we have the arguments. Thank you. Thank you. Thank you. Mr. Alley. Thank you, Your Honors. I'd just like to briefly respond to a couple points. First off, the opposer submits that a lot of these third-party uses aren't actually true and that they're gone or not on the Internet. That's simply not true. They're in evidence. The board relied on them and verified that they were in there. You can go to the websites now and see them, and you can see the evidence from 2012 that they were in the record. I don't know what opposer is saying when he says that they're not actually in use. They are. Opposer also says that his marks are incontestable and an argument of descriptiveness doesn't have a place here. This court has specifically said that pointing out that a mark has descriptive aspects is not a collateral attack on a mark, and an applicant is entitled to do so, whether it be before the USPTO or in an opposition proceeding. Here, there was nothing before the USPTO. The examiner allowed this mark, finding no likelihood of confusion, and passed it to publishing. So we just have the record in the opposition. But I think what I'd really like to reemphasize here, Your Honors, is under the facts of Jack Wolfskin and Juice Generation, they say you're not supposed to pick out elements of marks, especially... Did the examiner have before him or her the opposer's mark? He did, Your Honor. The record of the applicant's mark is of record, and you can see the examiner's search summary results. He does a query that specifically returns opposer's mark. No likelihood of confusion or rejection. So, as I was saying, Your Honors, in this opposition, we have the board below spending a whole two paragraphs discussing only two words in the marks. Just as this court said in Juice Generation and Jack Wolfskin, that is impermissible. What's even worse here is that you have a lot of evidence of record that the commercial impression of these marks is descriptive, that these marks are very, very common, that for years you've had users and other practitioners in intellectual property using marks with ideas and assets in both orders with no confusion occurring. The board should have taken that into account under the first factor. Had they done so, their finding there would have been consistent with the rest of the record, that there's simply no likelihood of confusion here based on these slogans. If there's no further questions, I'll submit the case to you. Thank you. Okay. Thank you, Mr. Alley. And thank you, Mr. Doolin. The case is taken under submission.